FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

AUG 21 2006

JAMES R. LARSEN, CLERK
_____DEPUTY
RICHLAND, WASHINGTON

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF WASHINGTON

Edwin H Hughes, a single man; Pro Se

Plaintiff,

v.

Fluor Hanford, Inc. a Washington corporation,; Hanford Environmental Health Foundation, a Washington corporation,; United States of America, by and through the Department of Energy, ; 004 OCAW, a labor union; Shaanti Lawrence, a single female, Danny R Lowe, and Jane Doe Lowe, husband and wife and marital community thereof, Larry Smick, and Jane Doe Smick, husband and wife and marital community thereof, JOHN DOES NOS. 1-10;

Defendants.

Civil Action No.

**CV-06-5063-EFS**

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

COMES NOW the plaintiff, Edwin H Hughes, appearing pro se, and for a complaint against

the defendants above named, states, alleges, and avers as follows:

Complaint 1

## JURISDICTION

1    This action is brought by Plaintiff seeking damages pursuant to The Federal Equal Employment Opportunity Laws - Retaliation.

2    This action is brought by Plaintiff seeking damages pursuant to The Occupational Safety and Health Act –Whistleblower Protection.

3    This action is brought by Plaintiff seeking damages pursuant to The Occupational Safety and Health Administration  – Whistleblower Program.

4    This action is brought by Plaintiff seeking damages pursuant to The Civil Rights Act.

5    Plaintiff is an individual of handicap and is entitled to protection against discrimination pursuant to Americans with Disabilities Act.

6    This action is brought by Plaintiff seeking damages pursuant to the Privacy Act of 1974.

7    All administrative remedies have either been exhausted, or the remedies are nonexistent due to the conflicts of interests the defendants have in providing those remedies to the plaintiff, and/or any such administrative remedy is a useless act because of the bias and/or conspiratorial act of the defendants. Venue lies appropriately with this court and this court has the jurisdiction to hear this lawsuit.

## PARTIES

8    Plaintiff Edwin H Hughes (hereafter "Hughes") is a single man, a citizen of the United States of America and a resident of Franklin County, Washington and is bringing this action on his own behalf.

Complaint 2

9    Defendant Tom Brown (hereafter "Brown") and Jane Doe Brown, husband and wife, were and are a martial community as recognized by the laws of the State of Washington.

10   Defendant Danny R Lowe, Ph.D. Clinical Psychologist (hereafter "Lowe") and Jane Doe Lowe, husband and wife, were and are a martial community as recognized by the laws of the State of Washington.

11   Defendant Shaanti Lawrence, Psy.D. Clinical Psychologist (hereafter "Lawrence") and John Doe Lawrence, is a single female, a citizen of the United States of America and a resident of Franklin County, Washington and is bringing this action on his own behalf.

12   Defendant Larry Smick, DO, MSPH (hereafter "Smick") and Jane Doe Smick, husband and wife, were and are a martial community as recognized by the laws of the State of Washington.

13   Defendant Fluor Hanford, Inc. (hereafter "FHI") has been and is doing business in Richland, Benton County, Washington. FHI was and is a corporation organized, registered and existing under the laws of the State of Washington and the laws of the United States of America and was the employer of the plaintiff at all material times hereto.

14   Defendant 004 OCAW Union (hereafter "union") is the labor union organization which purported to represent plaintiff in his claims of harassment, wrongful suspension and wrongful termination, and the plaintiff clams the union breached it's duty of fair representation due to the failure of the union to promptly, properly and adequately represent the plaintiff in clams against the employer.

15   Defendant United States of America (hereafter "USA"), by and through the Department of Energy, is a duly recognized agency of the Defendant USA and at all times material hereto, its

Complaint 3

employees were acting within the scope of employment as authorized representatives of the Defendant USA in conducting government business in the Eastern District of Washington.

16   Defendant Hanford Environmental Health Foundation (hereafter "HEHF"), a Washington non-profit corporation provided occupational medicine and industrial hygiene services for, inter alia, FHI and its employee. As such because of his status as an employee of FHI at material times hereto, Hughes was an intended third-party beneficiary of the DOE – HEHF contract.

17   Defendant John Does numbered 1-10 are those unnamed and unknown persons or entities acting singularly, or in contract, combination or conspiracy with the defendants named to cause damages to the Plaintiff as described in this action. When their identities are fully discovered this complaint shall be amended to more fully identify them. All of the claims asserted in this action are equally asserted against these John Doe defendants.

## BRIEF FACTS

18   Hughes worked for FHI's predecessors, Rockwell Hanford, Co. and Westinghouse Hanford Co., on the Hanford Nuclear Reservation site prior to October 1, 1996. On or about October 1, 1996 Hughes began working for FHI as a nuclear Process Operator, later known as a Nuclear Chemical Operator.

19   In 1983 Hughes was struck in the back of the head and upper back from a falling jumper / pipe weighing in excess of 1000 pounds in a high radiation at the PUREX facility, 200 East Area, Hanford Nuclear Reservation. The incident resulted in contusions to the back of the head and a ruptured L-4 – L-5 lumbar disk. Indisputable test confirmed a pinched nerve in the lower back causing partial loss of use in his left leg. Injury resulting in a Labor and Industries lost time injury and two back operations.

Complaint 4

20  Upon being released to return to work after the 1983 injury by Hughes's Labor and Industries attending doctor, Hughes was obligated to be released through HEHF. HEHF policy required Hughes see an HEHF Behavioral Health specialist before allowed to "Return To Work".

21  Hughes received no monetary settlement for his 1983 Labor and Industries covered injuries.

22  In 1987 Hughes's management required Hughes to report to HEHF after Hughes displayed extreme emotions do to marital problems.

23  In 1990 Hughes fell through a ceiling at the Operations Office of Solid Waste Operations building, 272WA, 200 West Area, Hanford Nuclear Reservation. The fall resulted in contusions to the forehead, contusions to the left knee, ACL damage to the left knee, a closed head injury resulting in severe headaches and memory loss resulting in a Labor and Industries (L&I) lost time injury. After returning to work several months later Hughes was found in a Central Waste Facility, mixed-waste storage building, 200 West Area, having a seizure. Neurological brain testing showed the closed head injury caused Hughes to become epileptic.

24  Lowe was head of the HEHF Behavioral Health department during the time Hughes was injured in 1990 to 2003.

25  HEHF has polices and / or procedures that violate State and Federal laws.

26  In 1991 Hughes had 2 operations, as a result from his fall through a ceiling, the first to remove his left "fractured" radial head at the elbow and the second to repair Hughes's anterior cruciate ligament (ACL) in the left knee.

/

Complaint 5

27  Upon being released to return to work after the 1990 injury by Hughes's Labor and Industries attending doctor, Hughes was obligated to be released through HEHF. HEHF policy required Hughes see an HEHF Behavioral Health specialist before allowed to "Return To Work".

28  All neurological brain testing performed on Hughes from 1991 to the present prove Hughes's has epilepsy. With Hughes taking the regiment of medication prescribed by Hughes's neurologist, neurological brain test indicate Hughes is borderline epileptic.

29  All neurological brain testing performed on Hughes from 1991 to the present provide evidence Hughes's condition has not significantly changed as long as he stays on the regiment of medication prescribed by Hughes's neurologist.

30  All blood work testing performed in conjunction with Hughes's neurologist neurological brain testing proved Hughes stays on the regiment of medication prescribed by Hughes's neurologist.

31  In 1995 Hughes was institutionalized for severe headache problems, by Lowe's request, at New Medico Brain Rehabilitation Center, where Hughes was subjected to repetitive testing and placed in harms way on numerous occasions.

32  HEHF refused to allow Hughes to return to work when he missed over 4 hours of work that were L&I related unless he provided an unconditional release from Hughes's attending doctor.

33  Fulltime FHI personal with known medical conditions that had a higher risk of threatening both their and fellow workers health and safety were not held by HEHF to the same stringent requirements as Hughes when returning to work.

34  In 1998 Hughes's management required Hughes to report to HEHF after Hughes displayed extreme emotions do to a personal relationship problem.

35   HEHF has well documented the severe headache problems Hughes suffered from Hughes's closed head injury to Hughes's termination in 2003.

36   Only Lowe makes mention of Hughes having Muchhausen Syndrome, a disorder only proven through the cooperation of medical doctors and extensive mental and physical testing.

37   Hughes does not have Muchhausen Syndrome.

38   Lowe took no recourse toward Hughes after Hughes lied 1998 to Lowe about Hughes health problems until 2003.

39   Lowe did no follow-up sessions with Hughes 1998 after Hughes lied to Lowe about Hughes health problems.

40   In 2000, a work suitability evaluation was preformed by HEHF and the result of that evaluation, a decision by FHI Human Resource Department and HEHF was to place Hughes on an early shift due to his medical condition.

41   The 2000 work suitability evaluation request to HEHF and the 2003 work suitability evaluation request to HEHF were both worded similarly with two dissimilar evaluations.

42   Lowe was head of the HEHF Behavioral Health department where Lawrence worked.

43   In 2002, Brown became Hughes's supervisor and /or manager.

44   Hughes was subject to hostile working environment during his employment with FHI.

45   Brown repeatedly told Hughes he could not drive golf carts across the sand but never told anyone else they could not drive golf carts across the sand.

46   Brown ranted and raved, contacted the Benton County sheriff, after Hughes stuck a 2 wheel drive pickup in sand. Brown turned Hughes into FHI Human Resources and Hughes was called into a disciplinary meeting. After a brief investigation Hughes was not charged with any wrong doing as Hughes was directed by Hughes's field manager / supervisor, Jim Mitchell, to leave the vehicle where it was and report to a class.

47   Brown told Don Pyzel (a supervisor / manager under Brown's authority) to find Hughes when Brown could not see Hughes at an afternoon training meeting. Brown did not inquire about other personal that were also not at an afternoon training meeting. Hughes was again into FHI Human Resources and Hughes was called into a disciplinary meeting where he was threatened with 3 day suspension and a letter in his file. After a brief investigation Hughes was not charged with any wrong doing as Hughes was returning items used for a company function to their proper place. Again Hughes's field manager had observed Hughes but was only contacted after FHI Human Resources had started disciplinary action.

48   FHI Human Resources requested Hughes complete a work suitability evaluation do to headache and emotional problems observed after the FHI Human Resources meeting above #48.

49   Brown's harassing, and negative comments towards Hughes occurred in front FHI employees during meetings.

50   Brown admitted in a supervisor / manager meeting that he (Brown) went through Hughes's locker without witnesses or Hughes permission.

51   When Hughes refused to sign a form before starting his 2003 work suitability evaluation Lawrence threatened Hughes with the statement "I will have to contact Marilyn Strankman (FHI-

human Resource Department) and tell her that you would not cooperate which may affect your job (job jeopardy).

52  Lawrence reviewed Hughes's HEHF files before Hughes had signed any forms allowing Lawrence legal consent.

53  Lawrence and Lowe discussed Hughes's HEHF files before Hughes had signed any forms allowing Lawrence and Lowe legal consent.

54  FHI has strict policies and procedures to prevent harassment of whistleblowers.

55  DOE has strict policies and procedures for itself and DOE contractors to prevent harassment of whistleblowers.

**GENERAL ALLEGATIONS**

56  All work suitability evaluation performed by HEHF required the input from a neurology specialist with the exception of Hughes's final work suitability evaluation in 2003, ignoring past practice, altering work suitability evaluation to fulfilling different FHI needs.

57  In Hughes's first sessions with in 1985, Cooper agreed repeatedly to meet with and repair Hughes relationship with wife.

58  In Hughes's first sessions with in 1998, Lowe agreed repeatedly to meet with and repair Hughes relationship with fiancée.

59  In 2000 the work suitability evaluation required the input from a neurology specialist and in 2003 the work suitability evaluation refused the input from a neurology specialist.

/

60  While employed by FHI, Tom Brown's harassing, unwelcome, and negative conduct towards FHI female employee occurred, on occasion, in front other FHI employees.

61  While employed by FHI, Tom Brown's harassing, unwelcome, and negative conduct towards Hughes occurred, on occasion, in front FHI employees.

62  While employed for FHI, Hughes, repeatedly informed FHI Human Resources of the harassing conduct by Brown and that Brown's conduct violated FHI polices and procedures, state and federal laws.

63  While employed by FHI, Hughes also advised FHI Human Resources when Brown's conduct worsened.

64  That the harassment of Hughes by Brown, while employed by FHI, was so severe and pervasive, from both an objective and subjective perspective, that it interfered with the performance of Hughes's job.

65  The FHI's failure to take prompt, effective and corrective action to stop the offensives, humiliating, demeaning, and unlawful conduct constitutes the violation of Hughes's Civil Rights.

66  The FHI's failure to take prompt, effective and corrective action to stop the offensives, humiliating, demeaning, and unlawful conduct constitutes the violation of other FHI female employee's Civil Rights.

67  The FHI's failure to take prompt, effective and corrective action to stop the offensive, humiliating, demeaning and unlawful conduct is in contravention and/or breach of FHI's Workplace Harassment Policy.

68  That as a direct and proximate result of FHI's unlawful and discriminatory conduct, Hughes was forced to take disability leave.

69  That as a direct and proximate result of FHI's unlawful and discriminatory conduct, Hughes has suffered and continues to suffer special and general damages including but not limited to past and/or future wages, mental anguish and emotional distress.

70  In 1994 Hughes was institutionalized, at Lowe's request, at New Medico Brain Rehabilitation Center, Seattle, Washington, where Hughes was subjected to repetitive testing, humiliation, anguish, torment and placed in harms way on numerous occasions.

71  Through information supplied by 004 OCAW, news reports and personal experiences Hughes "did not have any respect" for HEHF and / or HEHF Behavioral Health Services because of their deceptive practices and polices and procedures that violated State and Federal laws.

72  Lowe did no follow-up sessions with Hughes 1998 after Hughes lied to Lowe about Hughes health problems.

73  Lowe knew all medical documentation contradicted Hughes lie but never required Hughes to do follow-up sessions to clarify and allowed Hughes to continue working.

74  Lawrence violated Hughes civil rights by disallowing proper requested representation during the only work suitability evaluation with Hughes.

75   Lawrence threatened Hughes with the statement "I will have to contact Marilyn Strankman (FHI-human Resource Department) and tell her that you would not cooperate which may effect your job (job jeopardy).

76  DOE never contacted Hughes, a whistle blower about harassment, to investigate his claims against FHI and Brown.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

77  HEHF violated Hughes civil rights by disallowing proper representation leading to his termination which constitutes intentional or reckless infliction of emotional distress.

78  DOE failure to investigate the harassment claims against Brown by Hughes violated DOE's policies and / or procedures as a whistleblower disallowing proper representation leading to his termination which constitutes intentional or reckless infliction of emotional distress.

79  Smick is sworn to uphold the Hippocratic Oath but when reports turned over to Smick from HEHF Behavioral Health Services indicated Hughes may injure himself Smick did nothing. Smick's conduct towards Hughes constitutes intentional or reckless infliction of emotional distress.

80  Lowe repeatedly ignored Hughes in sessions and never followed up on if Hughes was lying about his medical condition. To bring to light information that may or may not be true, 5 years after the fact, confirm that Lowe's conduct towards Hughes constitutes intentional or reckless infliction of emotional distress.

81  Lawrence violated Hughes civil rights by disallowing proper representation. Lawrence unlawful conduct towards Hughes constitutes intentional or reckless infliction of emotional distress.

82  Hughes was subjected to an abusive, offensive and hostile working environment by the conduct of Brown. Brown knew or should have known that his harassing and unlawful conduct towards Hughes, a co-worker, would cause him emotional distress including but not limited to depression and other severe physical conditions, which would require medical care. That Brown's unlawful conduct towards Hughes constitutes intentional or reckless infliction of emotional distress.

83  Brown's harassing and unlawful conduct towards Hughes were extreme and outrageous. Brown's harassing and unlawful conduct towards Hughes constitutes intentional or reckless infliction of emotional distress.

84  That as a direct and proximate result of Brown's unlawful and discriminatory conduct as detailed above in BRIEF FACTS and GENERAL ALLEGATIONS, Hughes has suffered and continues to suffer extreme emotional distress including, but not limited to, depression and other severe physical conditions requiring Hughes to seek and receive medical care and to take disability leave.

85  That as a direct and proximate result of Brown's unlawful and discriminatory conduct, Hughes has suffered and continues to suffer special and general damages including but not limited to past and/or future wages, mental anguish and emotional distress.

86  004 OCAW failures to represent the harassment grievance Hughes filled against Brown, in a timely fashion, contributed to his termination.

87  004 OCAW failure to properly inform Hughes of all his legal rights at time of termination prevented time sensitive fling with Washington State Human Rights Commission, Equal

Complaint 13

Employment Opportunity Commission, Americans with Disabilities, Washington Department of Labor and Industries, Washington Employment Security Department, U.S. Department of Labor.

88   FHI failure to properly inform Hughes of all his legal rights at time of termination prevented time sensitive filing with Washington State Human Rights Commission, Equal Employment Opportunity Commission, Americans with Disabilities, Washington Department of Labor and Industries, Washington Employment Security Department, U.S. Department of Labor.

### FIRST CLAIM OF RELIEF

WHEREFORE, Plaintiff prays as follows:

89   For back wages, future wages, and interest pursuant to the Civil Rights Act of 1991and/or RCW 49.60.030(2).

90   For compensatory damages including, but not limited to, emotional pain, suffering, mental anguish and punitive damages pursuant to United States Civil Rights Act of 1991.

91   For costs and attorney's fees pursuant to The Civil Rights Act of 1991 and/or pursuant to RCW 49.60.030(2)(3); and for such other and further relief as the Court deems fair and equitable.

/

/

/

/

/

Complaint 14

Respectfully submitted,

Edwin H Hughes

3608 Road 84 Pasco WA

99301

PRO SE

Dated: 08-21-2006